**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| Kimberly **POTTER** | ) | |
| 175 S. Sandusky Street, Suite 212 | ) | |
| Delaware, Ohio 43015, | ) | |
| | ) | |
| *Plaintiff,* | ) | Case No. |
| *v.* | ) | |
| | ) | Judge |
| Debra Gorrell **WEHRLE** | ) | |
| Assistant Attorney General | ) | |
| Ohio Attorney General | ) | |
| 30 East Broad Street, 14th Floor | ) | |
| Columbus, Ohio 43215, | ) | |
| | ) | JURY DEMAND |
| *and* | ) | ENDORSED HEREON |
| | ) | |
| Aubrey **COOK** | ) | |
| Special Agent | ) | |
| Ohio Attorney General | ) | |
| 30 East Broad Street, 14th Floor | ) | |
| Columbus, Ohio 43215, | ) | |
| | ) | |
| *and* | ) | |
| | ) | |
| Richard **SCHLANGER** | ) | |
| 2745 First Street, Apt. 602 | ) | |
| Ft. Myers, Florida 33916, | ) | |
| | ) | |
| *and* | ) | |
| | ) | |
| **OHIO ATTORNEY GENERAL** | ) | |
| 30 East Broad Street, 14th Floor | ) | |
| Columbus, Ohio 43215, | ) | |
| | ) | |
| *Defendants.* | ) | |

## <u>COMPLAINT</u>

This action arises out of Defendants' misguided investigation involving the treatment of a

patient at Whetstone Gardens and Care Center between February 20, 2017 and March 5, 2017,

and the subsequent malicious prosecution of Plaintiff.  Plaintiff has suffered harm as a result of Defendants' actions in violation of Plaintiff's civil and constitutional rights.

## THE PARTIES

1.      Plaintiff, Kimberly Potter, is a citizen and resident of the State of Ohio.  She lives in Delaware, Ohio.

2.      Defendants, Debra Gorrell Wehrle ("Wehrle") and Aubrey Cook ("Cook") are current employees of the Ohio Attorney General ("Ohio AG").  Defendants Wehrle and Cook are each named in their individual capacities.

3.      Defendant, Richard Schlanger ("Schlanger"), is a retired medical doctor retained by the Ohio Attorney General for the purpose of providing an opinion and/or expert report regarding cause of death and the standard of care provided at the Whetstone Nursing facility and by Plaintiff.

4.      Defendant, the Ohio Attorney General, is a state governmental entity organized and existing under Ohio law.  At all times relevant hereto, the Ohio AG employed, trained, and supervised Defendants Wehrle and Cook as government employees.

5.      "Defendants" refers to all defendants collectively.

## JURISDICTION AND VENUE

6.      This Court has original jurisdiction in this matter pursuant to 28 U.S.C. §1331 (federal question jurisdiction).  Plaintiff's Complaint alleges violations of her federal civil rights by the defendants acting under color of state law, in violation of 42 U.S.C. §1983.

7.      Venue is proper in the Southern District of Ohio, Eastern Division, because Plaintiff resides in this Judicial District and the claims alleged herein arose within this Judicial District.

## BACKGROUND INFORMATION AND FACTS

8.      At all times relevant hereto, Whetstone Gardens Care Center ("Whetstone") was a long-term skill nursing facility serving patients in the central Ohio area.  Whetstone has both in-house skilled nursing staff and hires specialized outside nurses and other medical professionals on a contract basis.  Several of Whetstone's patients were individuals who were permanent residents with substantial physical impairments requiring intensive skilled nursing care. Whetstone resident, J.C., was one such patient.

9.      At all times relevant hereto, Central Ohio Hospitalist, D.B.A. MedOne Physician Group ("MedOne") had a contract with Whetstone for professional services related to the care of Whetstone's patients.  MedOne provided both doctors and Certified Nurse Practitioners ("CNPs") to Whetstone to assist in the care of Whetstone patients.

10.      At all times relevant hereto, Plaintiff was a CNP and resides in Delaware, Ohio. Plaintiff was an employee of MedOne who provided preventative and primary care services to Whetstone residents and patients, including J.C.  Plaintiff was an independent contractor to Whetstone.

11.      Sometime in 2017, the Ohio AG initiated an investigation involving the treatment of numerous patients at Whetstone Gardens and Care Center in Columbus, Ohio.  The Ohio AG's investigation alleged that numerous patients received inadequate treatment and care, and that numerous Whetstone staff falsified medical treatment documentation and forged signatures of nursing staff.  The allegations included that Whetstone resident, J.C., died as a direct result of neglect by six Whetstone employees and Plaintiff.

12.      Upon information and belief, the Ohio AG's investigation of Plaintiff's conduct was flawed and maliciously motivated against Plaintiff for the following reasons:

a. Ohio AG assistant prosecutor Wehrle inserted herself directly into the Whetstone investigation, meeting with numerous Whetstone staff witnesses and inappropriately directing the interview and investigation process.

b. The Ohio AG and special agent Cook developed a timeline that created a sequence of events that was based on Whetstone nursing and aide staff logs that the Ohio AG knew at the time to be falsified and inaccurate.

c. Based on the Ohio AG's unreliable timeline, Wehrle coached numerous Whetstone staff witnesses about the sequences and dates of events and encouraged and challenged witnesses to provide testimony consistent with the AG's unreliable and false timeline.

d. Ohio AG special agent Cook and other AG investigating agents authored several investigative summary reports which did not accurately capture the actual statements as captured during audio recorded interviews of numerous Whetstone witnesses.

e. Critical witness statement summaries, relied upon by experts and upon information and belief the grand jury, although captured by audio recordings, were edited, modified, supplemented, or completely deleted from the investigative summaries as they were created by agents of the AG's office.

f. These inaccurate, false, and misleading summaries were provided to Dr. Schlanger and as confirmed during his sworn testimony during the Plaintiff's criminal trial, they formed the basis of his opinion and/or expert report.

g. At trial and under oath, Schlanger testified that he relied upon written summaries provided to him by the Ohio AG and that, although readily available, he never listened to the original audio recordings. Schlager testified that specific and critical dates

- 4 -

directly reflecting Plaintiff's knowledge of J.C.'s condition were contained in investigative summaries when they were not.

        h.      The Ohio AG retained Schlanger as its medical expert as to the cause of death, who authored an expert report and, upon information and belief, offered either the expert report or testimony at numerous grand jury proceedings. The Ohio AG's investigation of Plaintiff's conduct was flawed and maliciously motivated against Plaintiff as related to Dr. Schlanger for the following reasons:

              i.      The Ohio AG and Wehrle maliciously encouraged or otherwise suggested to Dr. Schlanger to accept the AG's false and unreliable timeline as a basis for the sequence of events in the Ohio AG investigation.

              ii.      The Ohio AG and Wehrle maliciously provided unreliable, false and inaccurate investigative reports (including investigative report numbers 12, 86, 99, 173, and 189) to Dr. Schlanger and encouraged him to use these reports as a basis for his expert report. (Investigative Report 99 attached hereto as **Exhibit A**).

              iii.      Upon information and belief, at the direction of the AG and Wehrle, Dr. Schlanger provided either live grand jury testimony or his expert report based on the AG's unreliable timeline and the Ohio AG's inaccurate investigative summaries to the grand jury through testifying witnesses.

              iv.      Schlanger testified in person during Plaintiff's criminal trial (portions of which are attached at **Exhibit B**) and directly and unequivocally contradicted the contents of his own opinion and/or expert report (attached hereto as **Exhibit C**) that had, upon information and belief, been introduced and relied upon by all three grand juries returning the indictments against Plaintiff.

v.      By way of example and by no means an exhaustive list, Schlanger

stated in his expert report that,

"…there is no indication that Potter performed a full body skin examination (on February 23 the last days she saw J.C.), for if she had, she would have at a minimum seen the abnormal skin wound S. Everett saw three days earlier on February 20, 2017.  At that point Potter would have not only been able to link the drop in Mr. Chandler's hemoglobin to the wound on his backside but could have ordered appropriate medical interventions including transfer to an acute care facility."  *See* **Exhibit C** para. 3.

vi.      Investigative Summary 99 of Everett, however, makes *no mention*

*whatsoever* of the critical date of February 20, 2017 despite Schlanger's reliance

on that date in his report and in forming his opinion of Plaintiff having criminal

liablity, See **Exhibit A**.  Furthermore, during his live testimony during the

Plaintiffs criminal trial, Schlanger directly contradicted his report by saying his

only criticism of Plaintiff is her actions taken on March 1, 2017, ten days *after* he

had previously opined the Plaintiff should have acted.  See **Exhibit B** page 77 line

19-23.

vi.      Schlanger was the only medical doctor to provide an expert

opinion as to relevant medical issues which, upon information and belief, was

presented to both the Grand jury and during the Plaintiffs' criminal trial.

i.      Defendants conspired to intentionally present coached witness testimony,

knowingly unreliable timeline, knowingly inaccurate investigative reports, and coached

false medical expert witness testimony to secure three indictments against Plaintiff,

which were not otherwise supported by probable cause.

13.      In February 2019, Plaintiff was indicted for involuntary manslaughter (F3), gross

patent neglect (M1), and patient neglect (M2) in the Franklin County Common Pleas Court under

Case No. 19 CR 000763.  The Ohio AG's case was based on the theory that Plaintiff was an

agent of a care facility as defined by R.C. § 2903.33(A) and R.C. § 2903.34(A). (attached hereto as **Exhibit D**). There is absolutely no evidence whatsoever that Plaintiff was an agent of Whetstone.

14.     Plaintiff retained legal counsel, pleaded not guilty, and challenged the Ohio AG's theory of the case by filing a motion to dismiss the indictment where she argued that she could not be criminally liable because she was not an agent of Whetstone. Ultimately, the Court provided Plaintiff with a favorable ruling insofar as it defined the term "agent" in a way that would prevent the Ohio AG from moving forward with a successful prosecution of Plaintiff.

15.     Not to be deterred, the Ohio AG convened a second grand jury and maliciously presented the same unreliable timeline, inaccurate investigative reports, and testimony and/or expert report from Dr. Schlanger to obtain a second indictment against Plaintiff, this time on the theory that she had violated nursing home licensure requirements. In February 2020, Plaintiff was indicted for involuntary manslaughter (F3) and reckless homicide (F3) in the Franklin County Common Pleas Court under Case No. 20 CR 000963. (attached hereto as **Exhibit E**).

16.     Through legal counsel, Plaintiff again pleaded not guilty and challenged the Ohio AG's theory of the case by filing another motion to dismiss the indictment where she argued that licensing regulations of nursing homes and residential care facilities contained in R.C. § 3721 *et seq.* do not apply to her, as she is not involved in the operation of a nursing home facility. She is not licensed under that statute, nor is she regulated in any way by that statutory scheme. Plaintiff further argued that the Ohio AG was required to refer to evidence to the prosecuting attorney having jurisdiction over the matter before proceeding to the grand jury, which the Ohio AG failed to do. Ultimately, the Court agreed with Plaintiff's arguments and dismissed the first count of the second indictment.

17.     Not to be deterred even by this second adverse decision, the Ohio AG once again convened the grand jury and maliciously presented the same false information, unreliable timeline, inaccurate investigative reports, and testimony and/or the expert report from Dr. Schlanger to obtain a third indictment against Plaintiff, this time on the theory that she had violated certain statutes related to the care of a functionally impaired person in violation of R.C. § 2903.16.  In August 2020, Plaintiff was indicted for two counts of involuntary manslaughter (F1), knowingly failing to provide for a functionally impaired person (F4), and recklessly failing to provide for a functionally impaired person (F4) in the Franklin County Common Pleas Court under Case No. 20 CR 003803.  (attached hereto as **Exhibit F**).

18.     Through legal counsel, Ms. Potter again pleaded not guilty and prepared for trial. The three cases proceeded to trial beginning on Monday, January 3, 2022.  Over the course of three and a half days, the Ohio AG presented its case and produced numerous witnesses and documents in its case-in-chief.  At the end of the Ohio AG's case, Plaintiff moved for a Civ.R. 29 motion for acquittal which was granted by the Trial Court and all charges pending against Plaintiff were dismissed.

19.     At trial, Defendants produced the live testimony of Dr. Schlanger who testified inconsistently and in direct contradiction to the contents of his expert report that, upon information and belief, had been presented to the grand jury and formed the basis of all three indictments.

20.     Plaintiff was aware that if she was convicted or pled guilty, she faced both additional monetary and criminal sanctions as well as the affects of a criminal record on her life and professional occupation as the Plaintiff was and continues to be a certified nurse practitioner.

21.     Defendants' actions and/or omissions were pursuant to a policy, practice and/or custom of inadequate training of the Ohio AG employees, including the proper application and standards for investigations and initiating prosecutions.

22.     Defendants' actions and/or omissions were pursuant to a policy, practice and/or custom of inadequate supervision of Ohio AG employees.

23.     Defendants' actions and/or omissions were pursuant to a policy, practice and/or custom of inadequate investigation of Ohio AG employees who unlawfully maliciously prosecute citizens.

24.     Defendants' actions and/or omissions were pursuant to a policy, practice and/or custom of ratification of the conduct of Ohio AG employees who unreasonably and unlawfully maliciously prosecute citizens.

### COUNT ONE:  MALICIOUS PROSECUTION IN VIOLATION OF 42 U.S.C. §1983

25.     Plaintiff repeats and realleges the allegations set forth above as if fully restated herein.

26.     Following the incident described herein, the Ohio AG employees conspired to cause numerous serious criminal charges through the filing of three separate indictments to be filed against Plaintiff.  Defendants filed these charges without sufficiently investigating the incident and determining whether genuine probable cause existed for the filing of criminal charges against Plaintiff.

27.     Defendants' malicious prosecution of Plaintiff violated her rights under the Fourth Amendment to the United States Constitution.

28.     Defendants Wehrle and Cook, by investigating Plaintiff, producing false and unreliable timelines, false and inaccurate investigative reports, coached witness testimony

against Plaintiff, and making reports to the prosecutor's office about Plaintiff, made, influenced, or participated in the decision to prosecute Plaintiff criminally.

29.     Defendants' actions, participation and role in the investigation far exceeded their proper role of exercising prosecutorial discretion and encroached into the investigation and law enforcement decisions not a proper exercise of prosecutorial discretion.

30.     There was a lack of probable cause for the criminal prosecution of Plaintiff in all three indictments.

31.     The Defendants presented false and misleading information to all three grand juries, upon information and belief, by the introduction of Schlanger's opinion and/or expert report which contained false and misleading information directly related to the Plaintiff's culpability and the causation of J.C.'s death.

32.     Upon information and belief, Schlanger's false and misleading opinion and/or expert report is the only evidence offered by a medical doctor to all three grand juries.

33.     As Schlanger's false and misleading opinion and/or expert report was the only evidence offered by a medical doctor on the relevant medical issues of care and causation, the Defendants' prosecution of Plaintiff was not based on probable cause and would not have proceeded but for the false and misleading opinion and/or expert report authored by Schlanger and repeatedly introduced to the grand jury by Defendants.

34.     The legal proceedings instituted against Plaintiff deprived her of liberty and property.

35.     The criminal proceeding resolved in Plaintiff's favor.

36.     Defendants' malicious prosecution of Plaintiff was committed with ill will, malice and willful and/or a wanton misconduct directed toward Plaintiff.  Defendants' malicious

prosecution of Plaintiff was terminated by a dismissal based on the Common Pleas Court's ruling granting a Civ.R. 29 judgment of acquittal.

37.     As a direct and proximate cause of Defendants' unlawful conduct, Plaintiff has suffered extensive economic damage, forever reduced future professional employment opportunities, severe humiliation and embarrassment, and extreme and ongoing emotional distress.  Plaintiff seeks an award of compensatory and punitive damages and the legal fees she incurs in this action and to defend against Defendants' meritless criminal charges.

**WHEREFORE**, Plaintiff under all counts of the Complaint requests the Entry of Judgment for the following relief:

A.     Grant injunctive and prospective relief ordering the Ohio AG to require its employees to undergo additional training, education, and supervision so that Ohio AG employees will be better prepared to act in a reasonable manner and to better protect citizens they may confront and to discontinue future civil rights and constitutional violations;

B.     Award Plaintiff compensatory and punitive damages in an amount to be determined at trial;

C.     Award Plaintiff her attorneys' fees and costs to prosecute this action; and

D.     Award such other and further relief as may be just and proper.

Respectfully submitted,

/s/ Istvan Gajary
GREGORY S. PETERSON (0061915)
ISTVAN GAJARY (0089084)
PETERSON CONNERS LLP
545 Metro Place South, Suite 435
Dublin, Ohio 43017
(614) 365-7000
(614) 220-0197 (Facsimile)
gpeterson@petersonconners.com
igajary@petersonconners.com

*Attorneys for Plaintiff*
*Kimberly Potter*

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues triable under law.

/s/ Istvan Gajary
ISTVAN GAJARY



# INVESTIGATIVE REPORT

M20170023

## Office of the Attorney General - Medicaid Fraud Control Unit

150 East Gay Street, 17th Floor, Columbus, OH 43215, P (614) 466-0722, F (614) 644-9973, www.ohioattorneygeneral.gov

| | | |
|---|---|---|
| **Title** | **Report Date** | **Report No.** |
| Whetstone Gardens and Care Center | Mar 8, 2018 | 99 |
| **Incident** | **Opened** | |
| Nursing Facilities | Jan 20, 2017 | |

| | | |
|---|---|---|
| **Special Agent** | **Special Agent** | **Report By** |
| Amanda Ware | Stephanie Turrin | Aubrey Cook |
| **Special Agent** | **Special Agent** | |
| Michele Treadway | Carrie Ryan | |
| **Special Agent** | **Special Agent** | |
| Deborah Gearhiser | Tonia Brown | |
| **Special Agent** | **AAG** | |
| Aubrey Cook | Anthony Molnar | |

### Synopsis:

On March 2, 2018, Special Agent ("SA") TONIA BROWN ("BROWN") and SA AUBREY COOK ("COOK") interviewed former WHETSTONE GARDENS AND CARE CENTER ("WHETSTONE") State Tested Nursing Assistant ("STNA") SHATIA EVERETT ("EVERETT") at her home. The interview was recorded using an audio recorder. A CD was burned and placed into evidence (M20170023-069).

### Investigative Information:

1. On March 2, 2018, at 7:57 A.M., SA BROWN and SA COOK interviewed former WHETSTONE STNA EVERETT in the living room of her home located at 2437 Hanna Drive, Columbus, OH. The interview was recorded using an audio recorder and a CD was burned and placed into evidence under M20170023-069.

2. SA COOK informed EVERETT the interview is voluntary and she can request the agents to leave her home at anytime. EVERETT reported she was employed at WHETSTONE in 2015 and from February 2017 to April 2017. SA COOK told EVERETT the interview will focus on her employment during 2017. EVERETT verified State was at WHETSTONE investigating resident ROBIN TYNES ("TYNES") while she was employed there in 2017. EVERETT said she resigned from WHETSTONE because she went back to school, the staffing at WHETSTONE was a "big problem", there were last minute changes, and there were always issues. Overall, EVERETT expressed she didn't want to jeopardize her STNA license.



EXHIBIT A

3. EVERETT said during her employment in 2017, she worked first (1st) shift, 7:00 A.M. to 7:00 P.M., on TCU (Transitional Care Unit) 2. EVERETT estimated she was pulled to work the long term care (LTC) units or assisted living ("AL") roughly fifty percent (50%) of the time. EVERETT verified she worked with TCU 2 residents TYNES, JAMES CHANDLER ("CHANDLER"), and KELLEE HENDRICKS ("HENDRICKS").

4. On a good day, EVERETT said there was one (1) aide to twelve (12) patients. On a bad day, EVERETT said there were three (3) aides and two (2) nurses for all of TCU 2. EVERETT estimated there were roughly thirty (30) rooms (all single rooms) on TCU 2.

5. EVERETT informed the agents she has been a STNA for seventeen (17) years. EVERETT indicated management had changed a few times when she returned to work at WHETSTONE in 2017. Upon beginning employment at WHETSTONE, EVERETT said Registered Nurse ("RN") JESSICA CALDWELL ("CALDWELL") stepped down as the TCU 2 Unit Manager ("UM"). EVERETT said TCU 1 UM DAWN MILLER ("MILLER") then assisted with being the UM for TCU 2 as well as for TCU 1 until NYRA ENGLAND ("ENGLAND") was hired. EVERETT said she only met TCU 2 UM ENGLAND once.

6. EVERETT advised her orientation in 2017 consisted of going over all policy and procedure and shadowing STNA DANIELLE MCCORMICK ("MCCORMICK") on the floor for a period of five (5) days.

7. SA COOK explained to EVERETT restorative therapy is range of motion ("ROM") of a patient's limbs. SA COOK provided EVERETT with some examples of restorative therapy orders. SA COOK informed EVERETT while she was employed at WHETSTONE in 2017, TYNES, CHANDLER, and HENDRICKS all had orders for restorative therapy. EVERETT admitted she wasn't aware TYNES, CHANDLER, and HENDRICKS had restorative therapy orders. EVERETT said new aides at WHETSTONE only knew what to access in the kiosks based on what each aide's trainer showed them. EVERETT claimed STNA MCCORMICK never showed her the location of the restorative therapy order (if a patient was ordered restorative therapy) in the kiosk. When SA COOK inquired as to why nurses documented restorative therapy was being provided to TYNES, CHANDLER, and HENDRICKS when EVERETT and other aides were not aware the patients had restorative therapy orders, EVERETT said a lot of the times the nurses completed restorative therapy.

8. EVERETT claimed some nurses, such as CALDWELL and Licensed Practical Nurse ("LPN") MAEGAN VAN SYCKLE ("VAN SYCKLE"), went above and beyond their duties.

9. In regards to the documentation of ADLs (activities of daily living), EVERETT said WHETSTONE's policy was to document every time care was provided. EVERETT said staff wasn't able to document ADLs per policy all the time due to being short staffed. EVERETT admitted she wasn't able to document ADLs per policy all the time. EVERETT reported there were times she asked her nurse to enter ADLs or to empty a foley bag. EVERETT advised there were certain nurses who assisted the aides when asked. EVERETT said sometimes the kiosks in the hallway didn't work. When the kiosks didn't work, everyone was waiting to use a computer and STNAs had to write down the ADLs on a piece of paper. EVERETT said she would back date her ADLs when she wasn't able to enter them on the day she completed them due to the kiosks not

This report may contain Confidential Law Enforcement Investigatory Records, which may not be subject to public disclosure.

working. EVERETT confirmed staff is able to back date and time ADLs in the kiosks. EVERETT said she is unaware once the ADLs are printed on paper whether the record notes the entry was made on a different date and time than when the ADLs were provided. EVERETT said she had to back date and time ADLs "here and there". EVERETT said a nurse (name unknown) around mid shift would print off a list of patients that didn't have documentation of ADLs during that shift. EVERETT indicated CALDWELL would print out this as well when she was the TCU 2 UM. EVERETT denied being instructed to fill in ADLs when she didn't provide care to a specific patient.

10. EVERETT said nurses did approach aides, usually new aides, about inaccurate coding of the ADLs. SA COOK informed EVERETT there were several aides who documented TYNES, CHANDLER, and HENDRICKS were walking in the room and walking in the corridor. SA COOK told EVERETT there were also aides documenting TYNES was a limited assist. EVERETT reported TYNES is a total assist. When SA COOK inquired as to why so many aides were inaccurately coding ADLs for TYNES, CHANDLER, and HENDRICKS, EVERETT said she believes the aides were "rushed" when entering the ADLs into the system. EVERETT said there were issues with the kiosks freezing and at times the kiosks wouldn't allow the aides to see what they charted previously during the shift. Thus, the aides had to re enter all the ADLs to make sure they didn't miss documenting ADLs on any assigned patient.

11. EVERETT said Director of Nursing ("DON") JANE SOLT ("SOLT"), Assistant DON ("ADON") SANDRA BLAZER ("BLAZER"), and TCU 1 UM MILLER were aware of the issues with the kiosks not working correctly. EVERETT said they were told the nurse's computer was to be only used by the nurses and doctors. EVERETT said there were issues with how everyone was going to chart their ADLs when only a couple kiosks were working and they were not allowed to use the nurse's computer. EVERETT said it got to the point where aides were using their lunch time to attempt to chart ADLs. When SA COOK inquired as to DON SOLT and ADON BLAZER's response to the issues with the kiosks, EVERETT said they always told the aides anything not documented didn't happen so the aides had to find some way to chart their ADLs. EVERETT said DON SOLT and ADON BLAZER would at times put in work orders and other times they instructed the aides to call IT if they were having issues. EVERETT said she didn't have the time to sit on the phone with IT.

12. EVERETT said once staff looked at the schedule for the day, staff were able to tell whether the day was going to be "doomed". EVERETT estimated seventy-five percent (75%) of the time she knew the day was going to be "doomed" because of the people on the schedule and due to the short staffing.

13. EVERETT indicated WHETSTONE used a lot of agency staff, and agency staff didn't have access to the computer system. EVERETT said this made things even more confusing. EVERETT said she wouldn't sign off on another aide's work unless she observed them doing it. SA COOK informed EVERETT there was a covert camera placed in HENDRICKS' room and a lot of agency nurses were assigned to her during that time. EVERETT explained the night shift charge nurse was responsible for assigning agency to specific patients. EVERETT said she doesn't believe the night shift charge nurse even paid attention as to what nurses were from agency when making the assignments for day shift. EVERETT said, "You would think they would put a regular staff

This report may contain Confidential Law Enforcement Investigatory Records, which may not be subject to public disclosure.

nurse that knows her (Hendricks) there and it wasn't, it wasn't that way." EVERETT said assigning an agency aide to a high acuity patient, such as HENDRICKS, overwhelmed the regular nurses because agency was constantly approaching the nurses to ask questions. EVERETT said management said agency aides weren't allowed to be assigned to TYNES because of State's investigation.

14. EVERETT informed the agents DON SOLT never worked the halls and staff only saw her on the floor when there was a problem or to point out an issue brought to her attention. However, EVERETT voiced DON SOLT and ADON BLAZER weren't part of the "resolution" of the issues. At times EVERETT said therapy helped pass trays and various things. EVERETT said, "You hardly seen management help." EVERETT stressed she personally told DON SOLT, ADON BLAZER, and TCU 1 UM MILLER about the issues with staffing and the only reason she didn't walk out during a shift that was short staffed was because it would be considered abandonment. EVERETT said, "At one point or whatever Jane (SOLT) wasn't going to have any, uh, staffing on TCU (2) because it was, it was, becoming to be that bad and you don't, they don't look at the acuity of the person that you have to take care of. It was more like, just bodies. They would just go by, they would just go by how many people they had on the hall and split it." EVERETT indicated it was common to have four (4) to five (5) "max 2" patients in her section. EVERETT said most of the staff at WHETSTONE are female, she can't interrupt nurses during med pass, therapy was on the aides to get residents up, and night shift at times didn't get certain patients up for the day as they were supposed to. Due to these issues, EVERETT said there were times she wasn't getting to some patients for hours. EVERETT reported there were times she came in to start her shift and observed residents saturated in urine or feces, resulting in her having to give a bed bath and change linen. EVERETT said therapy refused to get any patients up. EVERETT voiced it got to the point where it was "overwhelming". When SA COOK inquired about management's response to the lack of staffing, EVERETT said ADON BLAZER will "blow your ass off". EVERETT said staff was told "it will be handled", yet EVERETT claimed staffing didn't improve. EVERETT said it was like staff's concerns about staffing were going in one (1) ear and out the other.

15. EVERETT said she knows TYNES was changed and turned every two (2) hours. SA COOK informed EVERETT a covert camera was placed in TYNES' room last year, and TYNES wasn't receiving the following care as ordered by several staff: turning and repositioning, being changed, restorative therapy, and wound care. EVERETT said in the one staff assignment alone, staff had TYNES, CHANDLER, HENDRICKS, a woman who required a hoyer, a man who was in hospice, a woman who wandered, and a man who was a total double amputee, and they were all high acuity in the same staff assignment area. EVERETT said a lot of times herself, LPN VAN SYCKLE, and STNA MCCORMICK were assigned to this area of high acuity patients; EVERETT described it as overwhelming. EVERETT said this issue of assigning one (1) aide to such a high acuity section was brought to management's attention. EVERETT said ADON BLAZER would tell the staff to try to smile. EVERETT said it was hard to smile when staff is constantly running from room to room to provide care and indicated staff barely was able to take breaks.

16. EVERETT said ADON BLAZER was known to point out how long a call light had been on to an aide. EVERETT said it takes longer than five (5) minutes to clean, wash, and dry a resident in the shower room. Sometimes ADON BLAZER answered the call lights, but most of the time EVERETT said management would sit back to see how long the call lights were on for. EVERETT

said management would tell staff they are a team and there is nothing they can't do, yet management didn't follow this concept.

17. EVERETT said shower and bath sheets were to be completed every shower day and every time a patient was given a shower or bath not on their assigned day. EVERETT said a shower/bath sheet was to be completed even when a resident refused. EVERETT said staff was to ask a patient three (3) times before officially marking it a refusal. In regards to residents who constantly refused showers/baths, EVERETT said some of the aides would witness each other asking the patients to take a shower/bath and the patients refusing instead of re-approaching those residents three (3) times. EVERETT said when a patient refuses a shower, they document this on the shower sheet and input it into the kiosk. EVERETT said the aides sign the shower sheets and the nurses sign off on the shower sheets. EVERETT said the only time aides went to ADON BLAZER to sign shower sheets was when ADON BLAZER worked the floor. EVERETT explained the shower/bath sheets are placed in a book stored at the nurse's station for the nurses to access and sign.

18. EVERETT said she has been in the room when nurses have completed TYNES' wound treatments. EVERETT said she has removed TYNES' wound dressing for being saturated with urine and/or feces and informed the nurse in order for the nurse to apply a new dressing. In regards to infection control, EVERETT said some nurses laid down barriers and changed gloves throughout the process of changing TYNES' dressings. EVERETT expressed she believed the nurses weren't following infection control policy due to being overwhelmed. EVERETT said TYNES was time consuming and took about forty-five (45) minutes. EVERETT said a lot of times staff was rushed in the morning, especially on TYNES' dialysis days, because night shift staff didn't complete her care and treatments. At times this resulted in the day shift nurses having to call dialysis to report TYNES would be late and transport at times became upset having to wait on staff to finish TYNES. EVERETT said instead of ADON BLAZER and management talking to the nurses once they received the information, EVERETT said it was more like management scolded the nurses. EVERETT said basically management wanted day shift staff to address the issue with night shift staff instead of management addressing the situation with night shift staff. Overall, EVERETT claimed the night shift nurses only got a slap on the hand and the day shift nurses were scolded.

19. In regards to supplies, EVERETT said TCU 2 supplies would be found on the LTC units. EVERETT said vital equipment and gloves were an issue as well as waiting for the supply personnel to come on shift or waiting for the nurse to go to the supply room to gather supplies. EVERETT said TIFFANY HOOD ("TIFFANY") was assigned supplies and scheduling, but then ANGIE KLINE ("ANGIE") took over supplies. According to EVERETT, TIFFANY and ANGIE stocked the supply carts, but she often overheard them questioning where the supplies went that they had previously placed in the cart(s). EVERETT said TIFFANY and ANGIE were good about telling staff to ask for extra supplies, especially when it came to specific supply for a specific resident. EVERETT said TIFFANY and ANGIE told staff to tell them if they removed a supply from another cart in order for them (TIFFANY and ANGIE) to replace the supply. EVERETT said night nurses failed to replenish the carts with supplies, resulting in day shift nurses running out of supplies. EVERETT said she has overheard nurses inform management the carts didn't have supplies. EVERETT said DON SOLT and ADON BLAZER questioned the nurses on the lack of supplies on

the cart(s) and would have them call TIFFANY. EVERETT said it got to the point where staff called ANGIE by noon to have ANGIE stock the carts. Overall, EVERETT expressed there was a lot of calling TIFFANY and ANGIE to bring supplies to the floor, and there was a lack of communication by night shift for supplies.

20. EVERETT said CHANDLER's refusal of care depended on the staff working with him. EVERETT said CHANDLER didn't have a problem with allowing her to wash his top half. EVERETT said CHANDLER didn't allow new staff to work with him. SA COOK informed EVERETT CHANDLER's care conference records indicate he requested specific staff, yet WHETSTONE didn't accommodate CHANDLER. EVERETT expressed she believes WHETSTONE didn't accommodate CHANDLER with specific staff because staff was being pulled due to being short staffed. EVERETT said STNA MCCORMICK worked with CHANDLER a lot. EVERETT said she knew upon returning to work after being off, CHANDLER was going to have an attitude based on who had been assigned to him.

21. EVERETT said she was aware CHANDLER had wounds. EVERETT denied CHANDLER had wounds the entire time she was employed at WHETSTONE. EVERETT reported she began employment at WHETSTONE the beginning of February 2017. Around mid February 2017, EVERETT said she was washing down CHANDLER and she noticed streaks and little specks of blood on his backside when she turned him over. EVERETT said she told CHANDLER he needs to allow the aides to turn him more because the area looked red. EVERETT said she notified LPN VAN SYCKLE, LPN VAN SYCKLE instructed EVERETT to apply barrier cream to the area, and EVERETT said she applied the barrier cream. EVERETT said she was off a couple of days and upon return, CHANDLER's skin appeared to look the same. EVERETT said she didn't expect CHANDLER's skin to improve during that time because of his size and his failure to want to get out of bed.

22. EVERETT said towards the end of February 2017 she turned CHANDLER as she was cleaning him up. Upon turning CHANDLER, EVERETT said there was a "smell" and CHANDLER's sheets were "bloody". EVERETT said she asked CHANDLER if he was feeling okay because of the look of his wound and the fact she was told during report he hadn't really been eating; CHANDLER responded he felt okay. EVERETT explained CHANDLER always liked to have a cup of ice, a glass of water, and a cup of pop. However, that day EVERETT voiced CHANDLER only wanted ice and kept saying he was so thirsty. EVERETT said LPN VAN SYCKLE was working this day and had EVERETT check CHANDLER's blood pressure, which EVERETT said was a little elevated. EVERETT said his bottom looked like it had tiny little holes, there was pus, it looked "scorched red", and the wound had an odor. EVERETT described the wound as looking like "hamburger meat". EVERETT said she notified LPN VAN SYCKLE of the wound. EVERETT claimed LPN VAN SYCKLE used four (4) bottles of saline to clean CHANDLER's wound, applied anti fungal cream, and applied a dressing. EVERETT said LPN VAN SYCKLE then called the doctor and attempted to get CHANDLER sent to the ER but was unsuccessful. When SA COOK inquired how EVERETT knew LPN VAN SYCKLE was attempting to have CHANDLER sent to the ER, EVERETT said she heard and observed LPN VAN SYCKLE making calls. EVERETT said LPN VAN SYCKLE was very frustrated and overwhelmed and threatened to quit if something wasn't done. EVERETT denied seeing Certified Nurse Practitioners ("CNP") KIM POTTER ("POTTER") and RUSSELL MILLER ("MILLER") in the building during her shift that day. EVERETT recalled ADON BLAZER came by

This report may contain Confidential Law Enforcement Investigatory Records, which may not be subject to public disclosure.

and began looking at what LPN VAN SYCKLE was doing and who she was calling in regards to CHANDLER. EVERETT said LPN VAN SYCKLE was flustered and frustrated because she had other patients, one who needed meds, who required her attention. EVERETT said she heard LPN VAN SYCKLE tell ADON BLAZER she was dealing with a "critical" with CHANDLER. EVERETT claimed ADON BLAZER responded, telling LPN VAN SYCKLE to not over exaggerate as it's not critical, to watch what she says, and to continue to call the on- call doctor. EVERETT said instead of ADON BLAZER taking some of the pressure off of LPN VAN SYCKLE by examining CHANDLER, ADON BLAZER passed a med for LPN VAN SYCKLE. As far as EVERETT is aware, ADON BLAZER never looked at CHANDLER's wound that day.

23. EVERETT reported she was off the next day and when she returned she was told CHANDLER was transported to the hospital. EVERETT said the day CHANDLER was sent to the ER (March 1, 2017) was the day after she discovered his coccyx wound appearing to look like hamburger meat. According to EVERETT, LPN VAN SYCKLE told her the day they discovered CHANDLER's wound appearing to look like hamburger meat, she stayed at work until roughly 9:00 P.M. EVERETT said she wasn't even in a rush to leave work because she wanted to provide LPN VAN SYCKLE with as much help as she needed.

24. EVERETT estimated it was around 1 1/2 - 2 weeks time period from the time she observed CHANDLER's skin start to break down to the time it looked like hamburger meat and had an odor. EVERETT said she doesn't believe all the staff were monitoring CHANDLER's wound during this time period. EVERETT said she heard LPN VAN SYCKLE pass on the information of CHANDLER's wound to either RN ILLUMINEE "MINEE" MUHONGERE ("MINEE") or LPN AKOSUA AYARKWA ("AYARKWA"). EVERETT claimed there wasn't a UM for TCU 2 at this time; thus, LPN VAN SYCKLE wasn't able to seek assistance from that position.

25. EVERETT described HENDRICKS as "hard regardless". EVERETT said HENDRICKS' legs were so contracted it didn't matter how staff repositioned her in bed, as she always slouched down. EVERETT said HENDRICKS yelled out when she was in pain. EVERETT said due to HENDRICKS' mucus and her coughing, staff had to change her gown a couple times per shift. EVERETT expressed she doesn't believe HENDRICKS received the proper care when agency worked with her. EVERETT said HENDRICKS didn't like new/unfamiliar people working with her as she would shake her head no and her blood pressure ("bp") would spike. EVERETT said ADON BLAZER was aware HENDRICKS became distressed with new staff and agency staff as HENDRICKS' bp increased when new staff/agency staff provided care to her. EVERETT said family witnessed this as well. When SA COOK inquired why they continued to assign agency staff to work with HENDRICKS when they knew this caused HENDRICKS distress, EVERETT voiced she doesn't believe they cared.

26. EVERETT said when State was in the building, management was on the floor. EVERETT said staffing increased when State was in the building. EVERETT claimed WHETSTONE offered bonuses for staff to pick up extra shifts while State was in the building.

27. EVERETT said her biggest concerns were in regards to TYNES, CHANDLER, and HENDRICKS as they had the highest acuity.

This report may contain Confidential Law Enforcement Investigatory Records, which may not be subject to public disclosure.

28. EVERETT said she overheard nurses say to management they can't document what they can't get to, and inquire to management what their next step is if they can't get to it or it doesn't get done. EVERETT noted a lot of nurses were working over. EVERETT claimed management told the aides if they have work to do past the end of their shift, they were to clock out and return to complete their work. EVERETT said they had a mandatory meeting with DON SOLT, ADON BLAZER, and MACINTOSH ("MACINTOSH") Chief Operating Officer ("COO") JOHN DUNN ("DUNN") and they were talking about staff taking advantage of the time clock. EVERETT said DON SOLT, ADON BLAZER, and COO DUNN instructed the aides there is no overtime and to clock out at the end of your shift and then complete charting, etc.

29. EVERETT expressed concerns of accepting admissions when WHETSTONE knew they didn't have the staffing. Further, the admissions were scheduled at around 6:00 P.M. / 6:30 P.M. when a shift ends at 7:00 P.M. and management expected staff to complete everything by the end of their shift.

30. SA COOK thanked EVERETT for her time and cooperation. The interview concluded at 9:24 A.M.

**Attachments:**

Attachment # 01: Party Details
Attachment # 02: WHETSTO99.AUD.WMA

**Approved By**
Charles Angersbach
Special Agent Supervisor
Mar 8, 2018



# PARTY DETAILS

M20170023

**Office of the Ohio Attorney General Health Care Fraud**
150 East Gay Street, 17th Floor, Columbus, OH, 43215 Phone: (614) 466-0722 Fax: (614) 644-9973
www.ohioattorneygeneral.gov

Whetstone Gardens and Care Center
   Cases: M20170023 (500-0471)
   WHETSTONE GARDENS AND CARE CENTER (D), ROBIN TYNES (V)

## Shatia Everett - Witness

*Witness*



| | | | |
|---|---|---|---|
| **Age** 39 years Born ▇ 1979 | **Identifiers** Not Entered | **Traits** Not Entered |
| **SSN** ▇▇▇ | **Defendant Status** Not Entered | **Aliases** Not Entered |
| **Gender** Female | **Comment** Not Entered | |
| **Ethnicity** Black | | |

## INCARCERATIONS (*ARRESTS)

| Date | Agency |
|---|---|
| Not Entered | |

## WARRANTS

| Date | Number | Agency |
|---|---|---|
| Not Entered | | |

## CASE

| Case No./Type | Status | Charges |
|---|---|---|
| M20170023 MFCU - Investigation | Active | |

## CONTACT

Home (Current)
2437 Hanna Drive
Columbus, OH 43211
Franklin County

Business
3710 Olentangy River Rd
Columbus, OH 43214
Franklin County

Phone
*Mobile:*    (614) 549-0882

Printed: 3/6/2018 11:35:32 AM
JCReports030921

This report may contain Confidential Law Enforcement Investigatory Records,
which may not be subject to public disclosure.

Page: 1 of 2

## PHYSICAL CHARACTERISTICS

| | |
|---|---|
| *Eyes:* | Brown |
| *Hair Color:* | Black |
| *Height:* |  |
| *Weight:* | |

## INJURIES

Not Entered

## AFFILIATIONS

| Employment | Education | Threat Groups |
|---|---|---|
| Whetstone Gardens and Care Center | Not Entered | Not Entered |

## PERSONAL

Relationships
Not Entered

This report may contain Confidential Law Enforcement Investigatory Records, which may not be subject to public disclosure.

1  February and March 1st?

2  A.  In the medical record, no.

3  Q.  No.  Okay.  You, I believe just

4  testified, maybe two hours ago, that on the 23rd

5  of February --

6  MR. PETERSON:  What was his words?

7  MR. GAJARY:  Not ill.

8  Q.  -- that Mr. Chandler was not ill on

9  February 23rd.  That's what you said, right?

10  A.  Based on that note, he was not ill.

11  Q.  Okay.  So on the 23rd, the last day

12  Ms. Potter saw him, he was not ill, correct?

13  A.  According to her note, yes.

14  Q.  And there is nothing in the medical

15  record from the 23rd to 1st that indicates she was

16  notified of any wounds or change to that status,

17  correct?

18  A.  That's correct.

19  Q.  Okay.  So let's go to the 1st.  Your only

20  criticism of her, then, as I understand it now, is

21  the delay from when she got there to when he went

22  to the hospital; is that right?

23  A.  Yes.

24  Q.  That's your criticism?

25  A.  Actually --

EXHIBIT B

1        Q.   You just said yes.

2        A.   Yes.  Yeah.

3        Q.   You also indicate this hemoglobin

4    business?

5        A.   Yes.

6        Q.   I'm not going to pretend to understand

7    it, but I can tell you this:  He had hemoglobin of

8    7.1 and 7.3 at Whetstone, right?  You testified

9    about that?

10       A.   Yes.

11       Q.   And are you aware at Riverside his

12   hemoglobin was 8.5?

13       A.   Yes.

14       Q.   Okay.  And also, as to his blood

15   pressure, his blood pressure when they put him in

16   medical transport was pretty much stable, right?

17       A.   Yes.

18       Q.   Normal, right?

19       A.   (Witness nods head.)

20       Q.   And you decided that that must be a

21   mistake?

22       A.   Yes.

23       Q.   And that's to -- you're testifying to a

24   reasonable degree of medical certainty, the

25   medical transport people must just not have done

Anthony Molnar, Senior Assist. Attorney General
Ohio Attorney General's Office
Health Care Fraud Section, Patient Abuse/Neglect Unit
150 East Gay Street, 17th Floor
Columbus, OH 43215

Dear Mr. Molnar:

You asked me to express an opinion in the death Mr. James Chandler. In that capacity I reviewed the Riverside Medical Center (Riverside) records from March 1, 2017 through March 5, 2017. I also reviewed his entire resident stay at Whetstone Gardens and Care Center (Whetstone) from November 12, 2014 until his transfer to Riverside on March 1, 2017. In addition, I reviewed records from Grant Wound Center in 2015; Columbus Podiatry and Surgery, Inc.; a February 27, 2017, e-mail from Jessica Caldwell to Sandra Blazer, and investigative reports 12, 86, 99, 173, and 189.

As far as my background, I am a licensed physician in the state of Ohio, board-certified by the American Board of Surgery as well as a certified wound specialist and hyperbaric specialist by the Committee of Medical Specialties. I performed my surgical training at the Ohio State University from 1981 through 1987. In 1997, I established the Wound Center at Park Medical Center which is now University Hospital East. I was Medical Director at the Wound Center from 1997 to 2018, when I retired. During that time, I was on the Advisory Board of the National Healing Corporation from 1997 to 2000. From 2000 to 2006 I served as Corporate Medical Director for the National Healing Corporation. I have performed clinical research, including original research in the area of wound care. I have presented multiple papers nationally and internationally, also in the area of wound care, and I have authored book chapters concerning soft tissue infections and hyperbaric oxygen therapy. My Curriculum Vitae (CV) is included with this report.

Mr. Chandler was born with a congenital defect known as Spina Bifida. Spina Bifida is a birth defect where there is incomplete closing of the backbone and membranes around the spinal cord. The most common location is in the lower back, as was the case with Mr. Chandler, causing paralysis and lower leg deformity. Depending on the location of the Spina Bifida, other organs may be affected, such as the bladder and bowels. Due to his Spina Bifida, Mr. Chandler had a urinary tract diversion done very early in his childhood, where the urine was rerouted to exit through a stoma in the right lower quadrant of his abdomen. In addition, Mr. Chandler, at some point in time, had a colostomy placed, allowing for an alternative channel for feces to leave his body.

Unfortunately, along with his other conditions, Mr. Chandler became morbidly obese and movement became difficult, making him susceptible to pressure ulcers. Mr. Chandler's obesity, coupled with his inability to move, led to an inversion of his urostomy stoma, causing the urine to leak out and pool around his backside. The moisture caused by the pooling of the urine would have been a contributing factor for Mr. Chandler to develop breakdown of the skin on his lower extremities. Skin breakdown can lead to a bone infection, known as osteomyelitis. Mr. Chandler did indeed develop skin breakdown in his lower extremities with osteomyelitis resulting in radical amputations of his lower extremities. This would make mobility even more of a challenge for Mr. Chandler, as he would have limited to no ability to independently turn on his side.

1

<span style="color:red">EXHIBIT C</span>

According to Whetstone records, Mr. Chandler was transported to Riverside on March 1, 2017, due to having hypotension (low blood pressure), tachycardia (rapid heart rate), mental status changes and acute hearing loss. (Refer to the SBAR or Situation Appearance Review and Notify Communication Form 3/1/2017). Once admitted to Riverside, Mr. Chandler was noted to have a soft tissue necrosis of his buttock and posterior thigh which required immediate surgery for debridement. (Operative Note, Riverside 1 of 3, pp. 89-93) Photographs taken preoperatively in the early morning hours on March 2nd show significant soft tissue necrosis with blistering and exposed subcutaneous tissue. (ICU pictures, Neal Sharma MD, Rmh Medical ICU 2) Once Mr. Chandler was taken to the operating room, radical debridement was performed on his skin, subcutaneous tissue and fascia (or the fibrous tissue which encases muscles and organs). It is important to mention that hospital personnel were not able to identify the source of the infection until he was physically examined by the Intensive Care Unit (ICU) team in the early morning hours of March 2, 2017. (See ICU pictures taken at 2:39 AM)

By the time Mr. Chandler was admitted to Riverside, blood and wound cultures indicate that the infection had already reached his blood stream making him globally infected. (See Riverside records, 1 of 3, pp. 152-156) The wound cultures demonstrated multiple gram-positive and gram-negative bacteria, but no further identification was made, due possibly to Mr. Chandler passing away.  However, the blood cultures were positive for Enterococcus Faecalis (a Gram-positive bacteria inhabiting the gastrointestinal tract of humans), and Beta Streptococcus (a common bacterium often carried in the lower intestines or lower genital tract). In addition, Mr. Chandler's blood cultures showed a Coagulase Negative staphylococcus, which is a normal flora found on the skin and mucous membranes.  What is significant is that these types of bacteria and flora which were found in the blood cultures do not originate in the blood, but rather in the intestinal tract and/or skin. Both the Enterococcus Faecalis and Beta Streptococcus are very virulent pathogens, indicating a severe infection (throughout the body) and requiring the implementation of an immediate first-line antibiotic regiment.

 Sepsis is an overwhelming infection involving multiple body systems, the lungs, heart, circulatory system, kidneys and brain, due to active bacteria entering the blood and lodging in vital organs. This causes an inflammatory response from the immune system, known as SIRS or Systemic Inflammatory Response Syndrome.  SIRS is the body's natural defense reaction which will try to protect the brain, the heart and the kidneys. This inflammatory response causes the blood vessels to become more porous, allowing white blood cells to travel easier to the infection site.  The bacteria, in response to the inflammation, release a toxin which causes the blood vessel muscles to relax, which in turn causes a drop in the blood pressure thus prohibiting blood from being able to travel effectively to the brain, heart and kidneys.

According to the investigation in this matter, the first time there was any indication of a severe skin change was on February 20, 2017, when healthcare worker S. Everett found Mr. Chandler to have bloody sheets. (Investigative Report 99, ¶ 22) When she rolled him over, S. Everett noted a foul odor and found his bottom looking like "hamburger meat" in that it had "tiny holes", "pus" and was "scorched red". According to S. Everett, she reported her findings to the assigned nurse. At this point there is no medical documentation of Mr. Chandler's wounds. On February 27, 2017, health care worker, T. Thompson observed Mr. Chandler's "whole backside including his back and legs, to be broken down and deteriorated and even green in color". (Investigative Report 12, ¶ 14) She thought he had gangrene growing. According to Thompson, she relayed this information to Jessica Caldwell. No documentation was noted, but Caldwell sent an e-mail at 6:54 PM, on February 27, 2017, to Sandy

Blazer, stating that Mr. Chandler had "a few necrotic areas to his coccyx and groin. Kind of impossible to measure. Not sure how long they have been there. And he has all over a lot of skin breakdown and tears. Could use an air mattress. Documented refusal of care and refusal of urostomy. Grote wound on bottom healed". The progression – from skin breakdown with pus present, to necrotic changes – is consistent with soft tissue death and shows a course of a serious, untreated soft tissue infection. The infection, when left untreated, resulted in a septic condition, and ultimately Mr. Chandler's death.

On February 20, 2017, Mr. Chandler's backside was found to be like "hamburger meat", with pus and scorched red skin, demonstrating signs of skin infection. (Investigative Report 99) This infection, coupled with Mr. Chandler's other medical issues – immobility, morbid obesity, and extreme moisture from urine leakage and stool contamination – required immediate attention from an advanced level care provider in the form of obtaining blood cultures, administering antibiotics and intravenous hydration, and ordering new wound treatments, as the then-existing ones were inadequate and inappropriate. If such medical care was not available at Whetstone, Mr. Chandler required transfer to an acute care setting.

On February 23, 2017, a Daily Progress Note shows that Mr. Chandler had a Hemoglobin of 7.3 two days earlier on February 21, 2017. (MedOne Daily Progress Note, February 23, 2017, signed by Certified Nurse Practitioner (CNP) Kimberly Potter (Potter)). This is a very low hemoglobin level. A normal hemoglobin for someone in Mr. Chandler's condition would be anywhere between 10 to 12 gm/dL. Hemoglobin is a molecule that is linked to the red blood cell which allows the cell to capture and transport the oxygen to vital organs. Without adequate hemoglobin, vital organs can be deprived of oxygen. Low hemoglobin could result from inflammation, infection or from chronic blood loss. It is imperative that an advanced level care giver rule out the cause of Mr. Chandler's hemoglobin level. In Potter's progress note, she documented that Mr. Chandler's skin was warm, dry and with no ecchymosis. However, there was no indication that Potter performed a full body skin examination, for if she had, she would have at minimum seen the abnormal skin wound S. Everett saw three days earlier on February 20, 2017. At that point Potter would have not only been able to link the drop in Mr. Chandler's hemoglobin to the wound on his backside, but could have ordered appropriate medical interventions including transfer to an acute care facility.

By February 27, 2017, when nurses were aware that Mr. Chandler had necrotic or dead tissue (See February 27, 2017, e-mail from Caldwell to Blazer), it was unexplainable why he was not sent out to a hospital or acute care facility. The "hamburger meat" condition meant Mr. Chandler had a localized skin infection, which with cultures, aggressive antibiotics, and intravenous hydration at an acute care facility, could more than likely have been controlled, without a risk of sepsis. However, with the onset of necrosis, which means the infection has invaded the tissue and more than likely entered the blood stream, a more serious infection known as sepsis can occur. At this point the medical care Mr. Chandler would require exceeded the capabilities of Whetstone.

On February 28, 2017, at 10:21 AM, a fax was sent from Whetstone to Columbus Podiatry and Surgery, Inc. Not only was this consult not ordered STAT or URGENT, but Columbus Podiatry would not be able to offer any treatment that would have addressed Mr. Chandler's needs.

According to a late entry report by Sandra Blazer, RN, written on March 2, 2017, at 5:19 PM, a CNP had assessed Mr. Chandler in the morning of March 1, 2017, (no exact time was offered by any documentation) due to his complaint of "not being able to hear" as well as his "frequent refusals for

daily hygiene and new report of open areas on buttocks" (Whetstone Progress Notes of Blazer, Sandra, RN, March 2, 2017). According to Blazer's note the only order given initially was to change the previous ordered blood work to STAT (there is no indication that the blood work order was ever processed). It was not until later in the day that the CNP called back and ordered him to be sent to the ER. It is incomprehensible why Mr. Chandler was not sent to the hospital the morning of March 1st, given the vital signs and symptoms the CNP observed during her assessment of Mr. Chandler, including the dangerously low blood pressure of 58/41, along with the identification of Mr. Chandler's wound infection, hearing loss, low hemoglobin, etc. CNP Potter acknowledged that she was aware of Mr. Chandler's very low blood pressure, low hemoglobin, decreased oxygenation saturation, tachycardia, and the existence of multiple wounds, all warranting immediate transfer to the hospital. (March 1, 2017, Daily Progress Note, signed by CNP Potter at 9:19 PM) Not only should the CNP have ordered an immediate transfer, she should have also conveyed to an advanced level care provider at the hospital as to the existence and nature of the severity of the Mr. Chandler's wounds, so that they could be assessed and treated without further delay.

According to the investigation, Mr. Chandler was not transported to the hospital until 5:56 PM on March 1, 2017. (Critical Care EMS Transport, Investigative Report 173, attachment) This was an unknown number of hours after he was first found with hearing loss, and Defendants were aware that he had a necrotic wound on his sacrum and buttocks. (Blazer March 2, 2017 Progress Note and Potter, March 1, 2017, Progress Note) There is no indication in the Riverside emergency room records that the ER staff was placed on notice that Mr. Chandler had a necrotic, gangrenous wound on his backside. (Riverside records, 1 of 3, pp. 8-9) Rather, the records indicate an "arrival complaint" of "tachypnea, tachycardia, altered mental status, anemia, decreased hearing", with the chief complaint being "hearing loss". (Riverside records, 1 of 3, p. 8; Critical Transport report) It was not until the Intensive Care Unit (ICU) team examined Mr. Chandler in the early morning hours of March 2, 2017, that the source of the infection was identified (See Riverside photographs, March 2, 2017, taken at 2:39 AM). Upon discovery, an emergency surgical consult was ordered and at 7:14 AM, Mr. Chandler was taken into surgery. (Riverside records, 1 of 3, p. 97) According to the surgeon, Dr. John David Leff, MD, the "only issue that could be identified" as the cause of Mr. Chandler's presenting signs and symptoms was a "foul smelling, progressed sacral decubitus". (Leff Operative Note, Riverside records, 1 of 3, p. 88)

Dr. Leff began debriding the necrotic tissue from an opening overlying Mr. Chandler's sacrum. The area debrided was approximately 20 x 18 cm to a depth of 4-5 cm. Dr. Leff was able to insert his hand into the necrotic tract, which extended "all the way up to Mr. Chandler's supragluteal fold." Dr. Leff did not feel comfortable debriding all the skin warranting removal because doing so would have left no position for Mr. Chandler to lie on. Dr. Leff then, according to his note, debrided the skin of Mr. Chandler's left buttock. The buttock area debrided was 18 cm x 12 cm, which was also necrotic. From his note, Dr. Leff expressed that there was a high likelihood that Mr. Chandler would die, despite surgical intervention. I interpret Dr. Leff's note to mean that, by the time Mr. Chandler was transported to Riverside, sepsis had invaded his vital organs, and removal and treatment of the original infected area would not have increased Mr. Chandler's chance of survival.

On the other hand, if appropriate action had been taken earlier (i.e. surgical debridement, aggressive antibiotic administration, intravenous hydration, etc.), on February 20, 2017; February 23, 2017; February 27, 2017; February 28, 2017; or even the morning of March 1, 2017, Mr. Chandler's chance of survival would have increased. Accordingly, I opine to a reasonable degree of medical certainty that the

4

Defendants' failure to provide timely treatment and care to Mr. Chandler allowed a localized infection to develop and progress into sepsis. With the same certainty, I opine, when left untreated, the sepsis advanced to overwhelming multi-system organ failure and ultimately Mr. Chandler's death.

Should you have any further questions please do not hesitate to contact me.

Sincerely,

5/15/19

Richard F Schlanger, MD, PhD, FACS, FACWP, CWSP

5

0B105 - C45

# IN THE COMMON PLEAS COURT
## FRANKLIN COUNTY, OHIO
### CRIMINAL DIVISION

STATE OF OHIO
COUNTY OF FRANKLIN, ss:

**KIMBERLY POTTER**

**INDICTMENT FOR:**

Count One: Involuntary Manslaughter, a
Felony of the Third Degree, O.R.C.
§2903.04(B), 2903.04(C)

Count Two: Gross Patient Neglect, a
Misdemeanor of the First Degree, O.R.C.
§2903.34(A)(2), 2903.34(D)

Count Three: Patient Neglect, a Misdemeanor
of the Second Degree, O.R.C. §2903.34(A)(3),
2903.34(E)

(Total: 3 Counts)

In the Court of Common Pleas, Franklin County, Ohio, of the Grand Jury term beginning
January 11, 2019.

The Jurors of the Grand Jury of the State of Ohio, duly selected, impaneled, sworn, and
charged to inquire of crimes and offenses committed within the body of Franklin County, in the
State of Ohio, in the name of and by the authority of the State of Ohio, upon their oath do find
and present that:

## COUNT ONE - KIMBERLY POTTER
## INVOLUNTARY MANSLAUGHTER

From on or about February 20, 2017 to on or about March 5, 2017, in Franklin County,
Ohio, as a continuing course of criminal conduct, Kimberly Potter did cause the death of J.C.
and such death was the proximate result of Kimberly Potter committing or attempting to commit
the misdemeanors of Gross Patient Neglect and/or Patient Neglect, in violation of Ohio Revised
Code §2903.04(B), 2903.04(C), Involuntary Manslaughter, a Felony of the Third Degree.

**EXHIBIT D**

0B105 - C46

## COUNT TWO - KIMBERLY POTTER
## GROSS PATIENT NEGLECT

From on or about February 20, 2017 to on or about March 1, 2017, in Franklin County, Ohio, as a continuing course of criminal conduct, Kimberly Potter did, while owning, operating, administering, or as an agent or employee of, a care facility, to wit: Whetstone Gardens and Care Center, commit gross neglect against J.C., a resident or patient of said facility, in violation of Ohio Revised Code §2903.34(A)(2), 2903.34(D), Gross Patient Neglect, a Misdemeanor of the First Degree.

## COUNT THREE - KIMBERLY POTTER
## PATIENT NEGLECT

From on or about February 20, 2017 to on or about March 1, 2017, in Franklin County, Ohio, as a continuing course of criminal conduct, Kimberly Potter did, while owning, operating, administering, or as an agent or employee of, a care facility, to wit: Whetstone Gardens and Care Center, commit neglect against J.C., a resident or patient of said facility, in violation of Ohio Revised Code §2903.34(A)(3), 2903.34(E), Patient Neglect, a Misdemeanor of the Second Degree.

Contrary to the statute in such case made and provided and against the peace and dignity of the State of Ohio.

Dave Yost
Ohio Attorney General

By:

Anthony Molnar #0081163
Senior Assistant Attorney General
Debra Gorrell Wehrle #0062747
Senior Assistant Attorney General
Kaitlin Helms Wolf #0097534
Assistant Attorney General

150 East Gay Street
17th Floor
Columbus, OH 43215

Anthony.Molnar@OhioAttorneyGeneral.gov
Debra.Wehrle@OhioAttorneyGeneral.gov
Kaitlin.Wolf@OhioAttorneyGeneral.gov

(614) 466-0722 (Office)

0B105 - C47

(614) 644-9973 (Fax)

**A TRUE BILL**

Foreperson of the Grand Jury

Franklin County Ohio Clerk of Courts of the Common Pleas- 2019 Feb 13 6:11 PM-19CR000763

0B105 - C48

**Defendants:**

**NAME: Kimberly Potter**

HOME ADDRESS: 303 Morgan Ct., Delaware, OH 43015

BUSINESS ADDRESS:

DOB: 2/6/1966

RACE/SEX: White/Female

HEIGHT/WEIGHT: 5'4"/155

HAIR/EYES: Brown/Brown

SSN

LAW ENFORCEMENT AGENCY: Ohio Attorney General

DATE OF ARREST: N/A

| | |
|---|---|
| Count 1: | Involuntary Manslaughter, O.R.C. §2903.04(B), 2903.04(C) - F3 |
| Count 2: | Gross Patient Neglect, O.R.C. §2903.34(A)(2), 2903.34(D) - M1 |
| Count 3: | Patient Neglect, O.R.C. §2903.34(A)(3), 2903.34(E) - M2 |

## IN THE COMMON PLEAS COURT
## FRANKLIN COUNTY, OHIO
## CRIMINAL DIVISION

**STATE OF OHIO**
**COUNTY OF FRANKLIN, ss:**

**KIMBERLY POTTER**

**INDICTMENT FOR:**

Count One: Involuntary Manslaughter, a Felony of the Third Degree, O.R.C. §2903.04(B), 2903.04(C)

Count Two: Reckless Homicide, a Felony of the Third Degree, O.R.C. §2903.041(A), 2903.041(B)

(Total: 2 Counts)

In the Court of Common Pleas, Franklin County, Ohio, of the Grand Jury term beginning January 10, 2020.

The Jurors of the Grand Jury of the State of Ohio, duly selected, impaneled, sworn, and charged to inquire of crimes and offenses committed within the body of Franklin County, in the State of Ohio, in the name of and by the authority of the State of Ohio, upon their oath do find and present that:

## COUNT ONE - KIMBERLY POTTER
## INVOLUNTARY MANSLAUGHTER

From on or about February 20, 2017 to on or about March 5, 2017, in Franklin County, Ohio, as a continuing course of conduct, Kimberly Potter did cause the death of J.C. and such death was the proximate result of Kimberly Potter committing or attempting to commit a misdemeanor of any degree, a regulatory offense, and/or a minor misdemeanor to wit: violation of Ohio Revised Code § 3721.05(E), § 3721.13(A)(3), and § 3721.99(A), in violation of Ohio Revised Code §2903.04(B), 2903.04(C), Involuntary Manslaughter, a Felony of the Third Degree.

**EXHIBIT E**

## COUNT TWO - KIMBERLY POTTER
### RECKLESS HOMICIDE

From on or about February 20, 2017 to on or about March 5, 2017, in Franklin County, Ohio, as a continuing course of conduct, Kimberly Potter did recklessly cause the death of J.C., in violation of Ohio Revised Code §2903.041(A), 2903.041(B), Reckless Homicide, a Felony of the Third Degree.

Contrary to the statute in such case made and provided and against the peace and dignity of the State of Ohio.

Dave Yost
Ohio Attorney General

By:

Anthony Molnar #0081165
Principal Assistant Attorney General
Debra Gorrell Wehrle #0062747
Principal Assistant Attorney General
Kaitlin Helms Wolf #0097534
Assistant Attorney General

150 East Gay Street
17th Floor
Columbus, OH 43215

Anthony.Molnar@OhioAttorneyGeneral.gov
Debra.Wehrle@OhioAttorneyGeneral.gov
Kaitlin.Wolf@OhioAttorneyGeneral.gov

(614) 466-0722 (Office)

(614) 644-9973 (Fax)

**A TRUE BILL**

Foreperson of the Grand Jury

**Defendants:**

**NAME: Kimberly Potter**
HOME ADDRESS: 175 South Sandusky Street, Delaware, OH 43015
BUSINESS ADDRESS:
DOB: 2/6/1966
RACE/SEX: White/Female
HEIGHT/WEIGHT: 5'4"/155
HAIR/EYES: Brown/Brown
SSN: 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
LAW ENFORCEMENT AGENCY: Ohio Attorney General
DATE OF ARREST: N/A

| | |
|---|---|
| Count 1: | Involuntary Manslaughter, O.R.C. §2903.04(B), 2903.04(C) - F3 |
| Count 2: | Reckless Homicide, O.R.C. §2903.041(A), 2903.041(B) - F3 |

IN THE COMMON PLEAS COURT
FRANKLIN COUNTY, OHIO
CRIMINAL DIVISION

**STATE OF OHIO**
**COUNTY OF FRANKLIN, ss:**

**KIMBERLY POTTER**
**INDICTMENT FOR:**

Count One: Involuntary Manslaughter, a Felony of the First Degree, O.R.C. §2903.04(A), 2903.04(C)

Count One: Involuntary Manslaughter, a Felony of the First Degree, O.R.C. §2903.04(A), 2903.04(C)

Count Three: Knowingly Failing to Provide for a Functionally Impaired Person, a Felony of the Fourth Degree, O.R.C. §2903.16(A), 2903.16(C)(1)

Count Four: Recklessly Failing to Provide for a Functionally Impaired Person, a Felony of the Fourth Degree, O.R.C. §2903.16(B), 2903.16(C)(2)

(Total: 4 Counts)

In the Court of Common Pleas, Franklin County, Ohio, of the Grand Jury term beginning January 10, 2020.

The Jurors of the Grand Jury of the State of Ohio, duly selected, impaneled, sworn, and charged to inquire of crimes and offenses committed within the body of Franklin County, in the State of Ohio, in the name of and by the authority of the State of Ohio, upon their oath do find and present that:

## COUNT ONE – KIMBERLY POTTER
## INVOLUNTARY MANSLAUGHTER

From on or about February 20, 2017 to on or about March 5, 2017, in Franklin County, Ohio, as a continuing course of conduct, Kimberly Potter did cause the death of J.C. and such death was the proximate result of Kimberly Potter committing or attempting to commit a felony to wit: Knowingly Failing to Provide for a Functionally Impaired Person in violation of Ohio Revised Code § 2903.16(A), 2903.16(C)(1); in violation of Ohio Revised Code §2903.04(A), 2903.04(C), Involuntary Manslaughter, a Felony of the First Degree.

<span style="color:red">EXHIBIT F</span>

## COUNT TWO – KIMBERLY POTTER
## INVOLUNTARY MANSLAUGHTER

From on or about February 20, 2017 to on or about March 5, 2017, in Franklin County, Ohio, as a continuing course of conduct, Kimberly Potter did cause the death of J.C. and such death was the proximate result of Kimberly Potter committing or attempting to commit a felony to wit: Recklessly Failing to Provide for a Functionally Impaired Person in violation of Ohio Revised Code § 2903.16(B), 2903.16(C)(2); in violation of Ohio Revised Code §2903.04(A), 2903.04(C), Involuntary Manslaughter, a Felony of the First Degree.

## COUNT THREE – KIMBERLY POTTER
## KNOWINGLY FAILING TO PROVIDE FOR A FUNCTIONALLY IMPAIRED PERSON

From on or about February 20, 2017 to on or about March 1, 2017, in Franklin County, Ohio, as a continuing course of criminal conduct, Kimberly Potter did, while a caretaker of J.C., a functionally impaired person under her care, knowingly fail to provide J.C. with treatments, care, goods, and/or services necessary to maintain J.C.'s health and/or safety and said failure resulted in serious physical harm to J.C., in violation of Ohio Revised Code §2903.16(A), 2903.16(C)(1), Knowingly Failing to Provide for a Functionally Impaired Person, a Felony of the Fourth Degree.

## COUNT FOUR – KIMBERLY POTTER
## RECKLESSLY FAILING TO PROVIDE FOR A FUNCTIONALLY IMPAIRED PERSON

From on or about February 20, 2017 to on or about March 1, 2017, in Franklin County, Ohio, as a continuing course of criminal conduct, Kimberly Potter did, while a caretaker of J.C., a functionally impaired person under her care, recklessly fail to provide J.C. with treatments, care, goods, and/or services necessary to maintain J.C.'s health and/or safety and said failure resulted in serious physical harm to J.C., in violation of Ohio Revised Code §2903.16(B), 2903.16(C)(2), Recklessly Failing to Provide for a Functionally Impaired Person, a Felony of the Fourth Degree.

Contrary to the statute in such case made and provided and against the peace and dignity of the State of Ohio.

Dave Yost
Ohio Attorney General

By:

Anthony J. Molnar #0081163
Principal Assistant Attorney General
Debra Gorrell Wehrle #0062747
Principal Assistant Attorney General
Kaitlin Helms Wolf #0097534
Assistant Attorney General

150 East Gay Street
17th Floor

Columbus, OH 43215

Anthony.Molnar@OhioAttorneyGeneral.gov
Debra.Wehrle@OhioAttorneyGeneral.gov
Kaitlin.Wolf@OhioAttorneyGeneral.gov

(614) 466-0722 (Office)

(614) 644-9973 (Fax)

**A TRUE BILL**

Foreperson of the Grand Jury

## Defendants:

**NAME: Kimberly Potter**
HOME ADDRESS: 175 South Sandusky Street, Delaware, OH 43015
BUSINESS ADDRESS:
DOB: 2/6/1966
RACE/SEX: White/Female
HEIGHT/WEIGHT: 5'4"/155
HAIR/EYES: Brown/Brown
SSN: 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
LAW ENFORCEMENT AGENCY: Ohio Attorney General
DATE OF ARREST: N/A

| | |
|---|---|
| Count 1: | Involuntary Manslaughter, O.R.C. §2903.04(A), 2903.04(C) – F1 |
| Count 2: | Involuntary Manslaughter, O.R.C. §2903.04(A), 2903.04(C) – F1 |
| Count 3: | Knowingly Failing to Provide for a Functionally Impaired Person, O.R.C. §2903.16(A), 2903.16(C)(1) – F4 |
| Count 4: | Recklessly Failing to Provide for a Functionally Impaired Person, O.R.C. §2903.16(B), 2903.16(C)(2) – F4 |